**F I L E D**
United States Court of Appeals
Tenth Circuit

MAR 11 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ELENO AGUIRRE,

    Defendant-Appellant.

No. 95-2068

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-92-486-2-JC)**

---

Charles L. Barth, Assistant United States Attorney (John J. Kelley, United States Attorney, Laura Fashing, Special Assistant United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Brenda G. Grantland, Mill Valley, California, for Defendant-Appellant.

---

Before **BALDOCK** and **BRORBY**, Circuit Judges, and **DANIEL**,[*] District Judge.

---

**BRORBY**, Circuit Judge.

---

[*] The Honorable Wiley Y. Daniel, United States District Judge for the District of Colorado, sitting by designation.

A New Mexico federal jury convicted Eleno Aguirre on four counts in a multi-defendant, multi-count indictment, and the United States District Court for the District of New Mexico sentenced Mr. Aguirre to a term of 235 months imprisonment. Mr. Aguirre now appeals his convictions. We exercise jurisdiction over Mr. Aguirre's appeal pursuant to 28 U.S.C. § 1291 (1994).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Gabriel Rodriguez-Aguirre managed a family-run organization ("the Aguirre organization") specializing in the sale and distribution of large amounts of marijuana and cocaine. *United States v. Denogean*, 79 F.3d 1010, 1011 (10th Cir.), *cert. denied*, 117 S. Ct. 154 (1996). Between 1984 and 1992, the organization sold more than 20,000 pounds of marijuana and over 20,000 pounds of cocaine to narcotics traffickers in New Mexico, Arizona, Utah, Kansas, Massachusetts, and elsewhere throughout the United States. *Id.* The organization used narcotics proceeds to purchase real property and other assets. *Id.* Defendant Eleno Aguirre, the brother of Gabriel Rodriguez-Aguirre, was involved in the Aguirre organization.

On October 20, 1992, a federal grand jury in the District of New Mexico returned a twenty-three count indictment against Mr. Aguirre and twenty-one

other defendants, including Mr. Rodriguez-Aguirre. The bill of indictment charged Mr. Aguirre with conspiracy to distribute more than 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 841 (1994), and conducting a financial transaction with illicit proceeds with knowledge the transaction was designed to avoid federal reporting requirements, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(ii) and 2 (Supp. 1996). Mr. Aguirre pled not guilty to the charges against him, and proceeded to trial with his co-defendants in January 1994.

The original trial of Mr. Aguirre and his co-defendants lasted six months, becoming "the longest federal criminal trial ever held in the District of New Mexico." *United States v. Rodriguez-Aguirre*, 73 F.3d 1023, 1024 (10th Cir. 1996). After deliberating for more than six weeks, the jury was unable to reach a verdict on the majority of counts, and the trial judge declared a mistrial. *Id.* Neither the United States nor counsel for Mr. Aguirre objected to the mistrial.

In August 1994, the United States obtained a superseding indictment against Mr. Aguirre and nine of his co-defendants. In addition to the charges included in the original indictment, the superseding indictment contained additional charges against Mr. Aguirre. Count II charged Mr. Aguirre with

conspiracy to possess with the intent to distribute cocaine, and conspiracy to distribute cocaine. Count XIII charged Mr. Aguirre with receiving income from the distribution of controlled substances and investing this income in the E & J Lounge, in violation of 21 U.S.C. § 854 (1994). Count XVII charged Mr. Aguirre with possession with the intent to distribute more than five kilograms of cocaine.

The United States retried Mr. Aguirre and his co-defendants in November and December 1994. Prior to trial, the court randomly selected a jury panel of approximately 250 jurors at random from voter registration lists for the Roswell Division of the District of New Mexico. The district judge excused the remaining jurors *sua sponte* after reviewing the juror questionnaires; the court directed only 115 jurors to report for jury service. Six days prior to the start of trial, defense counsel were provided copies of the jury questionnaires for the panel that had been selected for service and learned that the court had excused the remaining jurors.

On the first day of trial, prior to jury selection, defendant Gabriel Rodriguez-Aguirre filed a motion to stay the proceedings, and defendant David

Morales filed a motion to quash the jury venire[1].  The motions alleged the jury venire panel seriously misrepresented the ethnic makeup of the District of New Mexico.  Specifically, the defendants claimed persons of Hispanic origin and American-Indian background were underrepresented.  The defendants sought a stay of the trial to allow time for an investigation of the ethnic background of all the jurors.  In addition, Mr. Morales' counsel, Paul Kennedy, advised the court orally of *United States v. Calabrese*, 942 F.2d 218 (3d Cir. 1991).  Mr. Kennedy argued *Calabrese* stood for the proposition that reversible error exists once a court excludes a juror prior to voir dire "simply because a juror knows a defendant."  Mr. Kennedy claimed it appeared the court had excused at least one juror because the juror stated he or she knew one of the defendants.

Following Mr. Kennedy's comments, the court held an evidentiary hearing at which Nancy Metzger, jury administrator for the Federal Court Clerk's office, testified.  Ms. Metzger stated the jury panel of approximately 250 jurors had been selected at random from voter registration lists.  Ms. Metzger testified that the district judge reviewed the juror questionnaires and directed her to excuse more

---

[1]  Pursuant to the court's order that "one motion made by one defense counsel applies to all [defendants]," all of the defendants, including Mr. Aguirre, adopted the motions of Mr. Rodriguez-Aguirre and Mr. Morales.

than 100 specific jurors. Ms. Metzger stated she did not know the ethnicity of either the excused jurors or the jurors who had reported for service.

The court then stated it had reviewed the individual juror questionnaires and "retained the stack of those who, for some reason or other, claimed that they couldn't serve." The court explained:

> I think it goes without saying that the ones that were not summoned, I never looked at the last name, whether it was [a] Hispanic surname or whether it was not a Hispanic surname, or whether they were American Indians or not. As a matter of fact, I'm not real sure that that's part of the questionnaire --

Ms. Metzger confirmed the jurors were not directed to list their ethnicity on the questionnaire forms.

The district court denied the defendants' motion to stay the proceedings and the defendants' motion to quash the jury venire. However, the court allowed the defendants to supplement the record within ten days of the completion of the trial with information concerning the racial composition of the District of New Mexico and the Roswell Division. None of the defendants chose to supplement the record with such information.

Following a one month trial, the jury returned a verdict against Mr. Aguirre

-6-

on all four counts the United States charged him with in the superseding indictment. Thereafter, Ms. Sonia Gallegos, Mr. Aguirre's co-defendant who was also convicted, filed a motion for a new trial. Mr. Aguirre adopted Ms. Gallegos' motion for a new trial pursuant to the district court's standing order that "anything that anybody files the others adopt." Mr. Aguirre argued, *inter alia*, he was entitled to a new trial because of jury misconduct. Mr. Aguirre attached an affidavit from defense investigator Kelly Owens to his motion. Mr. Owens testified that following the trial, he questioned nine of the twelve jurors who convicted the defendants. Mr. Owens stated that one of the jurors, Linda Howard, admitted looking up the dictionary definition of the word "distribution" on the evening after the first day of deliberations and orally sharing its definition with the other jurors on the following day. According to Mr. Owens, Ms. Howard stated the juror's discussed the meaning of "distribution" as it related to the guilt or innocence of Ms. Gallegos. Mr. Owens also testified juror Ronnie Warmuth claimed he had knowledge of another juror researching the dictionary definition of the word "hypothecate."[2] In his post-trial motion, Mr. Aguirre contended this

---

[2] The United States attached affidavits from jurors Ronnie Warmuth and Kerry Romine to the United States' response to Ms. Gallegos' motion for a new trial. Mr. Warmuth stated:

On further reflection, I do not believe that a dictionary was used at all. The only definition which was questioned regarded the word "pontificate" as used by the witness John Henry Lee. Mr. Kerry

-7-

improper juror conduct prejudiced him and entitled him to a new trial.

The district court denied Mr. Aguirre's motion for a new trial, rejecting the defendants' claim of jury misconduct. The court concluded the word distribution was one of common usage, and there was no indication any of the jurors relied upon its dictionary definition or that it "made any difference at all in the jury deliberations."

At sentencing, the district court determined Mr. Aguirre had an offense level of 38, a criminal history category of I, and a sentencing range of 235 to 293 months. The court sentenced Mr. Aguirre to a term of 235 months imprisonment on Counts II, XII and XVII. As to Count XIII, the district court sentenced Mr. Aguirre to a term of 120 months, to run concurrently with the 235 month sentence.

---

Romine, a fellow juror, knew the definition of this word and no dictionary was consulted.

Similarly, Mr. Romine testified that although a question arose during deliberations as to the definition of the word "pontificate," "the jury ... did not at any time consult a dictionary."

## II. ISSUES RAISED ON APPEAL

Mr. Aguirre raises three issues on appeal: (1) whether the district court's dismissal of over 100 jurors, off the record, and outside the presence of the defendants and counsel, violated Mr. Aguirre's constitutional rights and his rights under the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1878 (1994); (2) whether the district court abused its discretion in failing to grant Mr. Aguirre a new trial based upon the jury's misconduct in looking up the dictionary definitions of certain words; and (3) whether the superseding indictment filed after the mistrial should have been dismissed on grounds of prosecutorial vindictiveness.[3]

## III. ANALYSIS

### A. Jury Selection and Service Act

Mr. Aguirre first contends the district court's excusal of over half of the original jury panel, off the record and outside the presence of the defendants and counsel, violated the Jury Selection and Service Act and his constitutional rights under the Fifth and Sixth Amendments. 28 U.S.C. § 1867(d) requires all motions

---

[3] In his opening brief, Mr. Aguirre also argued the district court erred in summarily rejecting Mr. Aguirre's objections to his presentence report without a hearing and without findings of fact. (*Id*.) However, Mr. Aguirre withdrew this argument in a subsequent motion to strike. (Apt's motion to supplement and strike part III, at 1-2.)

challenging compliance with the Jury Selection and Service Act to be accompanied by a "sworn statement of facts which, if true, would constitute a substantial failure to comply with the [Jury Selection and Service Act]." In the recent appeal of Mr. Aguirre's co-defendant, Doloras Contreras, we determined Ms. Contreras' claim under the Jury Selection and Service Act was barred by the defendants' failure to accompany their motions challenging the district court's jury selection process with an adequate sworn statement as required by 28 U.S.C. § 1867(d). *United States v. Contreras*, __ F.3d ___ (10th Cir., Mar. 11, 1997). Here, as in *Contreras*, Mr. Aguirre failed to file a sworn affidavit in support of his motions challenging the district court's jury selection procedures. Consequently, Mr. Aguirre 's Jury Selection and Service Act claim is barred.

Also in *Contreras*, we denied Ms. Contreras' Fifth and Sixth Amendment challenges to the jury selection procedures. *See id.* at ___. Specifically, we determined Ms. Contreras could not establish a *prima facie* case of a fair cross section violation or an equal protection violation, and we concluded Ms. Contreras' Sixth Amendment impartial jury claim was without merit. *Id.* For the reasons stated in *Contreras*, we likewise find no merit in Mr. Aguirre's

constitutional challenges to the jury selection procedures.[4]

## B.  Jury Misconduct

Mr. Aguirre next contends the district court erred in failing to grant him a new trial based upon the jury's misconduct in using a dictionary to look up the definition of the words "distribution" and "pontificate."  It is well settled that a jury's exposure to extrinsic information gives rise to a rebuttable presumption of prejudice.  *See Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 923 (10th Cir. 1992); *United States v. Hornung*, 848 F.2d 1040, 1044-45 (10th Cir. 1988), *cert. denied*, 489 U.S. 1069 (1989); *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984).  To overcome this presumption, the United States must prove the jury misconduct was harmless to the defendant.  *Hornung*, 848 F.2d at 1044-45; *Marino v. Vasquez*, 812 F.2d 499, 505 (9th Cir. 1987); *Perkins*, 748 F.2d at 1534; *United States v. Kupau*, 781 F.2d 740, 744 (9th Cir.), *cert. denied*, 479 U.S. 823 (1986).

---

[4] In *Contreras*, we also determined the district court did not violate Fed. R. Crim. P. 43 or 28 U.S.C. § 753(b) by failing to dismiss the 132 jurors in open court and in the presence of the defendants.  *See id.* at ___.  To the extent Mr. Aguirre asserts claims under Rule 43 or 28 U.S.C. § 753(b), these claims are rejected pursuant to our reasoning in *Contreras*.

To determine whether the United States has overcome the presumption of prejudice, the court must objectively weigh all of the facts and circumstances of the case. *Mayhue*, 969 F.2d at 923-24.

> When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant.... [A]n objective test should be applied in making an assessment of whether the defendant was prejudiced by the extraneous information. The court "should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware."

*Hornung*, 848 F.2d at 1045 (citations omitted). The trial judge is "uniquely able to assess the likelihood that the extraneous information [considered by the jury] was prejudicial." *Mayhue*, 969 F.2d at 922.

In *Mayhue*, the jury foreman in a race discrimination case copied the dictionary definitions of the words "discriminate" and "prejudice" on to a piece of paper and read the definitions aloud to the other jurors during their deliberations. *Id.* at 921. The district court granted a new trial for the defendant based upon the jury's misconduct, and the plaintiff appealed. *Id.* at 921-22. On appeal, we cited a number of factors relevant to determining whether the presumption of prejudice has been rebutted when a jury consults a dictionary without authorization. *Id.* at 924. They are as follows:

(1)  The importance of the word or phrase being defined to the resolution of the case.

(2)  The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition.

(3)  The extent to which the jury discussed and emphasized the definition.

(4)  The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition.

(5)  Any other factors that relate to a determination of prejudice.

*Id.* at 924.  Applying these factors to the circumstances in *Mayhue*, we determined the trial court did not abuse its discretion in granting the defendant a new trial. *Id.* at 926.


In the instant case, the district court provided counsel for Mr. Aguirre with the opportunity to present evidence and oral argument on the issue of whether the court should grant Mr. Aguirre a new trial due to juror misconduct.  After careful consideration of the parties post-trial briefs and oral arguments, the court found:

> The word distribute is a word that's commonly used, has a meaning that I think all of us understand.  No showing that Ms. Howard or anybody else relied on what she saw, if anything, in whatever book she looked it up that made any difference at all in the jury deliberations.
>
> And I don't really care whether they looked up pontificate or not because that doesn't have anything to do with anything except it was a nice word and it was used, you know, in the course of the trial for a little humorous relief.

But I do not believe that the violation of my instructions to the jury not to seek out any evidence outside the courtroom and looking up the word distribute or distribution, since it's a word of common use, common knowledge, I find that it had no prejudicial effect on the jury whatsoever.

Accordingly, the district court denied Mr. Aguirre's motion for a new trial.

We now turn to the factors delineated in *Mayhue* to determine whether the district court properly concluded the presumption of prejudice was rebutted.

*1. Importance of the words.*

First, we note the word pontificate was unimportant to the resolution of the case. As the district court found, "pontificate" was used during the trial "for a little humorous relief." The record does not show, nor does Mr. Aguirre even allege, that the term had any relevance to the jury's deliberations or to the offenses Mr. Aguirre was charged with committing. Thus, assuming the definition of the word "pontificate" was even researched, Mr. Aguirre was not prejudiced by such conduct.

The jury's exposure to the dictionary definition of the word "distribution" requires a closer inquiry. Unlike "pontificate," the term "distribution" was important to the jury's deliberations. "Distribution" appears repeatedly

-14-

throughout the superseding indictment and the term is referred to in two of the counts Mr. Aguirre was charged with violating.

   *2. Extent to which dictionary and legal definitions differ.*

Notwithstanding the term's importance, the district court properly noted the term "distribution" is a word of common usage and common knowledge. Webster's Ninth New Collegiate Dictionary includes the following definitions for distribute: to divide among several or many; to spread out so as to cover something; to give out or deliver, especially to members of a group. Webster's New Collegiate Dictionary 368 (1984). Webster's provides the following synonyms for distribute: dispense, divide, deal, and dole. *Id.* In its instructions to the jury, the district court defined the term "distribution," in the context of drug conspiracy, to mean "the defendant intentionally delivered marijuana to another person." We do not believe the dictionary definition of distribution differs appreciably or is less demanding than its legal definition provided by the district court. If anything, the dictionary definition is more detailed than the court's definition. Thus, to the extent any of the jurors determined Mr. Aguirre engaged in distribution under the term's dictionary meaning, they also determined Mr. Aguirre engaged in distribution under its legal definition.

*3. Extent to which jury discussed and emphasized definition.*

Mr. Owens testified that Ms. Howard read aloud the dictionary definition of distribution to the other jurors. However, the record does not indicate any of the jurors relied upon or attached any significance to the definition. Although Mr. Owens questioned nine of the twelve jurors after their verdict, he did not allege any of them relied upon this definition in reaching their verdict. Nor did he testify that any of the jurors other than Ms. Howard recalled that the definition of distribution was even read to them. Thus, this factor weighs in favor of a finding that Mr. Aguirre was not prejudiced by the juror misconduct.

*4. Strength of evidence and whether jury had difficulty reaching verdict prior to introduction of definition.*

The United States introduced a plethora of evidence at trial establishing Mr. Aguirre's involvement in large-scale drug distribution and money laundering. Between 1985 and 1992, the Internal Revenue Service estimated Eleno Aguirre and his wife spent $2,127,244.95 more than their reported income. In 1992, federal agents discovered $1,800,000.00 in cash buried in the backyard of Mr. Aguirre. Indeed, Mr. Aguirre does not even challenge the sufficiency of evidence against him on appeal. Furthermore, there is no evidence in the record that the jury was deadlocked or was having any difficulty reaching a verdict prior to the introduction of the definition.

-16-

*5. Other factors relating to a determination of prejudice.*

Mr. Owens' affidavit indicates the term distribution was looked up and discussed as it related to the guilt or innocence of *Sonia Gallegos*. There is absolutely no evidence the term was researched or discussed in connection with the determination of Mr. Aguirre's guilt. Accordingly, this factor also indicates the juror misconduct was not prejudicial to Mr. Aguirre.

Based on the above factors, we conclude the district court properly determined Mr. Aguirre was not prejudiced by the juror misconduct. The record clearly establishes any juror impropriety was harmless to Mr. Aguirre. Consequently, the district court did not err in denying the defendants' motion for a new trial based on juror misconduct.

## C. Prosecutorial Vindictiveness

Finally, Mr. Aguirre contends the district court should have dismissed the superseding indictment because of prosecutorial vindictiveness. Following the mistrial, the United States filed a superseding indictment expanding the charges against Mr. Aguirre. Mr. Aguirre asserts the United States was aware of the information giving rise to the increased charges prior to his first trial. Given its prior knowledge, along with the fact the United States suffered negative publicity

-17-

following the mistrial, Mr. Aguirre contends vindictiveness motivated the increased charges.

We decided a virtually identical vindictive prosecution claim in the recent appeal of Mr. Aguirre's co-defendant, Doloras Contreras. *See Contreras*, __ F.3d at ___. In *Contreras*, based on the totality of the circumstances, we determined there was no reasonable likelihood the increased charges in the superseding indictment stemmed from prosecutorial vindictiveness. Based on our reasoning in *Contreras*, Mr. Aguirre's vindictive prosecution claim also fails.

## IV.  CONCLUSION

Based on the foregoing reasons, we hereby affirm the convictions of Mr. Aguirre in all respects.