**F I L E D**

<u>PUBLISH</u>

**October 26, 2005**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

 v.

HUONG MUESSIG; SONNY LEE
TRAN; NGA TRAN, also known as
TANYA TRAN,

  Defendants-Appellants.

Nos. 04-6005, 04-6033, 04-6055 *

**APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. CR-02-170-M)**

J. David Ogle, Ogle & Welch, P.C., Oklahoma City, Oklahoma, for Defendant-Appellant in Case No. 04-6033.

Paul Antonio Lacy, Assistant Federal Public Defender, Office of the Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant in Case No. 04-6005 submitted on the briefs.

R. Scott Adams, Adams & Associates, P.C., Oklahoma City, Oklahoma, for Defendant-Appellant in Case No. 04-6055 submitted on the briefs.

---

 * After examining the briefs and the appellate record for Case Nos. 04-6005 and 04-6055, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of these appeals.  *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G).  These two causes are therefore ordered submitted without oral argument.

Randal A. Sengel, Assistant United States Attorney (Robert G. McCampbell, United States Attorney, with him on the briefs, and Sue Tuck Richmond, Assistant United States Attorney, with him on the brief for Case No. 04-6005), Office of the United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee in Case Nos. 04-6005, 04-6033, and 04-6055.

---

Before **MURPHY** , **BALDOCK** , and **TYMKOVICH** , Circuit Judges.

---

**TYMKOVICH** , Circuit Judge.

---

Defendants-Appellants Huong Muessig, Sonny Lee Tran and Nga Tran were each convicted of violating 21 U.S.C. § 841(c)(2) by distributing pseudoephedrine with reasonable cause to believe it would be used to manufacture methamphetamine. On appeal, the defendants make five arguments. First, Muessig and Nga Tran argue the government's evidence was insufficient to establish knowledge under § 841. Second, Sonny Tran argues that the district court improperly allowed testimony from an undercover officer based on evidence that should have been disclosed prior to trial. Third, Sonny and Nga Tran each argue that the district court erred in failing to grant a mistrial after an unadmitted exhibit was inadvertently sent to the jury room. Fourth, Sonny Tran argues his conviction should be reversed due to cumulative error by the district court. Finally, Muessig argues that she is entitled to resentencing in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

We AFFIRM.

## I. Background

Sonny's Express Grocery and Smoke for Less are two Oklahoma City convenience stores that were operated by the Trans and Muessig at various times between June 2000 and September 2001. Both stores were subject to an undercover operation aimed at stemming illegal sales of pseudoephedrine for use in methamphetamine manufacturing.

On June 29, 2000, Detective Mark Wenthold and an informant entered Sonny's, which was then owned by Sonny and Nga Tran. Sonny Tran was working behind the counter. Wenthold and the informant spoke to Tran about buying a "large amount" of pseudoephedrine. At trial, Wenthold testified that during the course of this discussion, "it was decided that we would buy, I believe it was six bottles each, and then leave the store and immediately walk back in, and buy six bottles each again, immediately go back out, come back in, and buy another six bottles of pseudoephedrine." Tr. at 51-52. During one of the purchases, Wenthold told Sonny Tran that he and his companion were "making methamphetamine with [the pills]." Tr. at 52. Despite this, Tran continued to sell them the pills. In exchange for the pills, Wenthold and the informant paid Sonny Tran hundreds of dollars in cash.

On June 30, Wenthold and the informant returned to Sonny's, where Nga Tran, Sonny Tran's wife, was working behind the counter. Following the pattern of their first visit, Wenthold testified that he and the informant "each bought eight bottles . . . left the store, came back in, bought the eight bottles again, left the store, and did it a third time." Tr. at 52-53. Nga Tran charged them $112 per eight bottles, totaling $672 in cash. During the course of the transactions, Wenthold told Nga Tran he was willing to sell her some of the "stuff" they planned to make, and that the "stuff" could help her stay awake for days at a time. She told him she "wasn't into that kind of stuff." Tr. at 53.

On April 6, 2001, Wenthold returned to Sonny's alone.[1] During this transaction and subsequent visits to Sonny's and Smoke for Less, Wenthold was wired for audio and video recording. Muessig was working behind the counter when Wenthold arrived. After she expressed reluctance to sell him large quantities of pseudoephedrine, Wenthold urged her to telephone Nga Tran, which Muessig did. Muessig told Nga Tran (in Vietnamese) that she was "very afraid." Tr. at 121-122. Muessig then gave the telephone to Wenthold, who assured Tran (in English) that he "had bought pills there before and there hadn't been any trouble." Tr. at 56. During this conversation, Tran invited him to visit her new

---

[1]When asked why he did not return to the store for nearly ten months, Wenthold cited scheduling issues and difficulty procuring the funds necessary to make the purchases.

store to purchase pills. Following Wenthold's conversation with Tran, Muessig called Tran a second time and spoke with her again.

After the two telephone conversations, Wenthold and Muessig began to discuss the prospect of Wenthold purchasing pseudoephedrine pills. Muessig voiced concerns that Wenthold was "with the FBI." Tr. at 56. Wenthold told her that he had purchased pseudoephedrine pills at the store before, and "those people didn't go to jail yet, so everything was all right." Tr. at 56-57. This was apparently sufficiently convincing to Muessig, who then sold Wenthold 24 boxes of pseudoephedrine tablets, for which he paid her $250 in cash.

On April 13, at Nga Tran's invitation, Wenthold visited Tran's new Oklahoma City store, Smoke for Less. Nga Tran was working behind the counter. After Tran stated that she "recognized" Wenthold, she sold him 24 boxes of pseudoephedrine pills for $260. She also stated that "you scare people," and Wenthold reassured her he was not a police officer. Tr. at 74-76.

Wenthold returned to Sonny's on April 13, 2001. Muessig was behind the counter, and he told her he had $500 to spend on pseudoephedrine pills. They joked about her suspicions that he was with the FBI. Muessig joked that should refer to himself as "Mark, with the FBI" if he were to call her in the future. Tr. at 62. Before leaving the store, Wenthold purchased 36 boxes of pills for $460.

On April 19, 2001, Wenthold returned to Sonny's for the last time. Muessig was again behind the counter, and she repeated her concerns that he was with the FBI. Nonetheless, she sold him 24 boxes of pseudoephedrine pills for $300. On the same day, Wenthold also visited Smoke for Less, where Sonny Tran was working behind the counter. After a telephone call to Nga Tran, Sonny Tran told Wenthold the current price on pseudoephedrine pills. Wenthold told Sonny Tran that he "liked the bottles [of pills] because it was easy to cut open the bottles, instead of having to pop each individual pill out of the package like you have to do [with the packages]." Tr. at 77. Wenthold also discussed the process of cooking methamphetamine. Nonetheless, Sonny Tran sold him 16 bottles of pseudoephedrine tablets for $400 in cash.

On May 21, 2001, Wenthold again visited Smoke for Less. Nga Tran was working at the store, and she showed him a "blister pack" of pills, which Wenthold informed her he "didn't like," because "you had to pop each pill out." Tr. at 80. He also mentioned that he preferred bottles of pills because he "could cut the bottoms out of the bottles." Tr. at 81. Tran again told Wenthold that he "scared people," and that people "thought [he] was a police officer[.]" Tr. at 81. Despite her concerns, Tran sold Wenthold 25 bottles of pills for $700.

Wenthold made his last trip to Smoke for Less on September 27, 2001. Nga Tran was working behind the counter. Wenthold told Tran that he preferred

a particular kind of bottle, because he "liked to cut the bottoms out of them." Tr. at 85. They also discussed the prospect of having the pills delivered to Wenthold, but Tran did not appear interested in accommodating such a request. Before departing, Wenthold purchased 48 bottles of pills for $1200.

After these visits, the government concluded its investigation. Indictments were filed in October 2002.

## II. Discussion

### A. Sufficiency of the Evidence as to Muessig and Nga Tran

Muessig and Nga Tran each argue that the government did not present enough evidence to support their convictions. We review the record de novo for sufficiency of the evidence and uphold a conviction if, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences therefrom, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Nguyen*, 413 F.3d 1170, 1175 (10th Cir. 2005). In conducting this review, we accept the jury's resolution of conflicting evidence without weighing the credibility of witnesses. *United States v. Sapp*, 53 F.3d 1100, 1103 (10th Cir. 1995).

Section 841(c)(2) imposes criminal penalties on "[a]ny person who knowingly or intentionally . . . possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to

manufacture a controlled substance[.]" 21 U.S.C. § 841(c)(2). Neither Muessig nor Nga Tran contest that they knowingly distributed pseudoephedrine, or that pseudoephedrine is a listed chemical. They deny only that they had "reasonable cause to believe that it would be used to manufacture a controlled substance."

We have recently held in interpreting 21 U.S.C. § 841 that it is

> not sufficient for the government to prove that the defendant knew, intended, or had reasonable cause to believe that the substance would be abused or would be used illegally. Nor is it sufficient for the government to prove that the defendant was negligent or reckless with respect to the risk that the ephedrine or pseudoephedrine he sold would be used to manufacture methamphetamine. The government must prove the defendant was aware, or had reasonable cause to believe, that the substance would be used for the specific purpose of manufacturing methamphetamine.

*United States v. Truong*, __ F.3d __, 2005 WL 2644962, at *5 (10th Cir. Oct. 17, 2005) (internal citations omitted). In other words, there must be a showing of "actual knowledge, or something close to it" that the precursor drugs would be used to manufacture controlled substances. *Id*.

We find that the evidence was sufficient to prove this element of the crime as to both Muessig and Nga Tran.

### *Muessig*

Muessig argues a jury could not conclude she either knew or had reasonable cause to believe that the pseudoephedrine she sold would be used to make methamphetamine. According to Muessig, the evidence, at best, shows that she

-8-

had been told that selling large quantities of the drug could "get her in trouble," but that she never had been told or knew that the drug could be converted into methamphetamine.

At trial, DEA Agent Gary Lawson testified that a person using pseudoephedrine for its intended purpose and taking the maximum dosage per day would require two years to consume the 3024 tablets Muessig sold to Wenthold over a two-week time period. Tr. at 127-128. Thus, as a preliminary matter, a reasonable jury could infer from this fact that Muessig knew that the pseudoephedrine was not being used for its ordinary medicinal purpose. Other evidence established that Muessig had reasonable cause to believe the pseudoephedrine would be used for illicit purposes. For example, when Wenthold visited her store on April 6, 2001, Muessig stated that she was "afraid" and asked whether Wenthold was affiliated with the FBI. Furthermore, Muessig refused to sell the pills before first calling Nga Tran and receiving Wenthold's assurances that he had indeed purchased large quantities of pseudoephedrine pills in the past.

On top of this foundational evidence, the government produced additional evidence from which a reasonable jury could infer culpability. First, the evidence disclosed that Muessig had knowledge about the illicit uses of pseudoephedrine. At trial, Drug Enforcement Agency Agent Gary Lawson testified that after her arrest, Muessig admitted that (1) Nga Tran's sister, Anna Nguyen, a licensed

pseudoephedrine distributor, had informed Muessig of pseudoephedrine's illegal uses and that Muessig knew "drugs" were made from pseudoephedrine"; and (2) Muessig knew large-quantity sales were a red flag, because she said "[d]on't sell too much, don't sell too much. You have to be careful. The police will get you in trouble." Tr. at 131-32. Although Muessig denied in her trial testimony that she knew pseudoephedrine was used to make controlled substances, or that Anna Nguyen had told her that pseudoephedrine could be used to manufacture illicit substances, given Lawson's testimony the jury could have concluded otherwise. On appeal, we may not resolve conflicting evidence or weigh the credibility of witnesses; the credibility determination is for the jury at trial. *See United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir. 1997).

Muessig replies that no evidence was ever presented to show she received formal "notice" that the sale of pseudoephedrine for use in the manufacture of methamphetamine could expose her to criminal liability. However, formal notice, whether from pseudoephedrine distributors or the government itself, is not a required element of § 841(c)(2). Such notice is merely additional evidence that is typically employed to establish knowledge under the statute. *See, e.g., United States v. Nguyen*, 413 F.3d 1170, 1176 (10th Cir. 2005) (holding that defendant's receipt of warnings from his pseudoephedrine distributors was relevant to intent); *Truong*, 2005 WL 2644962, at *6 (finding no evidence that defendant was aware

of the illegal uses of pseudoephedrine, because no relevant conversations with undercover agents, statements by the defendant, or official warnings were indicated in the record).

In other words, whether Muessig received official notice of the illegal uses of pseudoephedrine is irrelevant in light of the other evidence produced at trial. Evidence of knowledge need not come in the form of an *ex ante* official notice about the illegal uses of pseudoephedrine. A reasonable jury could infer from Muessig's conduct and admissions that she had reasonable cause to believe the pseudoephedrine would be used to make controlled substances. Accordingly, taking the evidence as a whole, we believe a reasonable jury could have found Muessig guilty of violating 21 U.S.C. § 841(c)(2).

### *Nga Tran*

Nga Tran argues that the trial testimony was insufficient to prove she knew that the pseudoephedrine pills would be used to manufacture a controlled substance. The question, again, is the link between the large-scale sales of pseudoephedrine and the "actual knowledge or intent (or, in this Circuit, something 'akin to actual knowledge') that it would be used to manufacture methamphetamine," *Truong*, 2005 WL 2644962, at *7. On this record, we conclude that a jury could indeed find such knowledge.

To begin, Nga Tran testified at trial that she received prior notice that large-scale sales were illegal. Distributors had informed her that customers should not be allowed to purchase large quantities of pseudoephedrine tablets, and that such sales were unlawful. In fact, her sister, Anna Nguyen, was one of the distributors who supplied Sonny's and Smoke for Less. On two occasions Tran told Wenthold that he "scared people," and she expressed concern about being "set up" by the police as a result of Wenthold's conduct. Wenthold testified that he made his purchases in cash (in excess of the retail value) and acted "upset" with Tran when she tried to charge him tax on the purchases. In short, the record shows Nga Tran knew that the transactions with the undercover police were illegal.

In order to establish guilt under the statute, however, the government must also show Nga Tran knew or had reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance. The government's evidence supporting this element is found in both Wenthold's and Tran's testimony. Wenthold testified that on June 30, 2000, he had a conversation with Tran regarding his plans to use the pseudoephedrine for manufacturing. When asked if he ever mentioned to her that "an illegal substance" would be made with the pills, Wenthold answered, "yes, on the first occasion that I bought from her on 29th Street." Tr. at 104. Describing the

conversation at issue, Wenthold stated that he offered "to trade some of the stuff that we were making with the pills. I told her it would keep her up for days and she wouldn't need any sleep and she could work very hard. She told me she wasn't into that kind of stuff." Tr. at 53, 104. In her own testimony at trial, Tran was asked whether the agent told her he would "cook methamphetamine" with the pills. She answered, "I don't remember that he tell me, or not; maybe he do, but I do not know what does that mean or I didn't know anything about that." Tr. at 187. Finally, Wenthold testified (and the videotapes clearly showed) he informed Tran he liked to cut the bottoms from the pseudoephedrine bottles, and that he did not like receiving pills in packets because they required him to punch out the individual pills.

Based on this evidence, a reasonable jury could conclude that Nga Tran knew the pseudoephedrine sales were illegal and were to be used to manufacture controlled substances. We therefore find the government established sufficient evidence to sustain her conviction under 21 U.S.C. § 841(c)(2).

**B. Evidence Regarding Notice of Illegal Sales**

At trial, the government sought to introduce a customer verification form signed by Sonny Tran, which was designated as Exhibit 11. The form contained a notice from Southwest Sales Company, a pseudoephedrine wholesaler, warning retailers not to sell more than two packages at a single time to customers. The

district court excluded Exhibit 11 from evidence on the grounds that the government violated the disclosure requirements of the Federal Rules by not providing the document to defense counsel prior to trial. *See* Fed. R. Crim. P. 16(a)(1)(E).

The court, nonetheless, allowed Agent Lawson to testify that Southwest Sales had warned Sonny Tran "that if there were large purchases of pseudoephedrine, he should consider that a suspicious transaction[.]" Tr. at 176. Despite the exclusion of Exhibit 11, however, when the jury began its deliberations it was mistakenly given a copy of the exhibit along with the other trial exhibits.

Sonny Tran makes two arguments. First, he argues the district court failed to impose an adequate sanction in the form of a mistrial on the government for its discovery violation, or, at the very least, abused its discretion in nonetheless allowing testimony that Southwest Sales had warned him about large sales of pseudoephedrine after excluding the underlying document. Second, he argues, joined by Nga Tran, that the court erred by failing to declare a mistrial after Exhibit 11 was inadvertently supplied to the jury.

## 1. Sanctions for Nondisclosure

Sonny Tran first challenges the adequacy of the sanctions imposed by the district court on the government for its nondisclosure of Exhibit 11. We review for abuse of discretion. *United States v. Ivy*, 83 F.3d 1266, 1280 (10th Cir. 1996).

Rule 16(a)(1)(E) states that "[u]pon a defendant's request, the government must permit the defendant to inspect . . . papers [or] documents . . . if the item is within the government's possession, custody, or control and:

(i) the item is material to preparing the defense;
(ii) the government intends to use the item in its case-in-chief at trial; or
(iii) the item was obtained from or belongs to the defendant."

Fed. R. Crim. P. 16(a)(1)(E). Rule 16(d)(2) further states that if a party fails to comply with the requirements of Rule 16, the district court may "order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; grant a continuance; prohibit that party from introducing the undisclosed evidence; or enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2). In selecting a proper sanction, a court should consider the reasons the government delayed producing the requested materials, including (1) whether the government acted in bad faith; (2) the extent of prejudice to the defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance. *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999).

We find that the district court did not abuse its discretion. First, after concluding that the document should have been produced, it imposed a significant sanction by prohibiting the government from introducing the proposed exhibit. The court, however, decided that an additional sanction was unnecessary since the government had only attempted to admit the document in redirect after the defense opened the door to the testimony through its cross-examination of the prosecution's undercover agent. Second, Tran failed to show prejudice in light of other testimony establishing he had received notice from his sister-in-law that large-scale pseudoephedrine sales could be illegal. Moreover, Tran's theory of defense that he learned about the hazards of pseudoephedrine sales only after the sales alleged in the indictment could have been discounted by the jury apart from the testimony about the distributor's notice.[2] As a final matter, there was no reason to believe the government acted in bad faith in failing to disclose the document.

Accordingly, we conclude the district court did not abuse its discretion in (1) excluding Exhibit 11 as an appropriate sanction, (2) declining to declare a mistrial as an additional sanction, and (3) allowing Agent Lawson's limited testimony about the Southwest Sales warning.

---

[2] We also conclude that any error in the admission of the testimony would have been harmless. *See* Fed. R. Evid. 103(a); Fed. R. Crim. P. 52(a); *see also United States v. Velarde*, 214 F.3d 1204, 1211 (10th Cir. 2000).

## 2. Jury Exposure to Exhibit 11

Sonny and Nga Tran jointly argue the district court should have granted their motions for a mistrial because the jury was exposed to evidence that had not been admitted at trial. Approximately forty minutes after the jury began deliberating, the parties discovered that Exhibit 11 had been sent to the jury room along with the other trial exhibits. The court retrieved the document as soon as the mistake was discovered. While the jury continued its deliberations, the district court heard argument on the Trans' motion for a mistrial. The court concluded there was no reason to believe the jury had even seen, let alone been influenced by, the document. Nonetheless, the court sent into the jury an instruction stating that Exhibit 11 "was not admitted into evidence and was inadvertently submitted to you" and "you shall in no way consider this exhibit during your deliberations and in reaching your verdict disregard the exhibit entirely." Tr. at 271.

Sonny Tran argues that Exhibit 11, if viewed by the jury, sealed his fate since it showed prior knowledge that pseudoephedrine could be diverted for illegal purposes. Nga Tran's argument is that, as Sonny's wife, the jury would impute his knowledge to her.

The Tenth Circuit has "developed two different standards . . . to assess the impact of exposure to extraneous material on a jury." *Smith v. Ingersoll-Rand*

*Co.*, 214 F.3d 1235, 1241 (10th Cir. 2000) (discussing *United States v. Byrne*, 171 F.3d 1231 (10th Cir. 1999) and *United States v. Aguirre*, 108 F.3d 1284 (10th Cir. 1997)). Under the first standard, a new trial is appropriate if the "slightest possibility" exists that the exposure to extraneous material affected the verdict. *Id.* According to the second standard, however, jury exposure to extraneous information creates a "presumption of prejudice" which may be rebutted by a showing that the exposure was harmless. *Id.* The difference between the two standards lies in which party has the initial burden of proof. *Id.* at 1242. The *Ingersoll-Rand* court did not attempt to reconcile the standards since any error in that case was harmless.

As in *Ingersoll-Rand*, we also need not resolve these different approaches in this appeal. Under either standard, we find that the exposure here was harmless. First, the question of Sonny Tran's prior knowledge had been explored by both Wenthold and Lawson and the document added little weight to their testimony. Moreover, since the gist of Exhibit 11 had been offered through the testimony of Lawson, the exhibit itself was cumulative as to this testimony. With respect to Nga Tran, the exhibit did not mention her by name, nor did it suggest she had signed a similar notice or even knew about the one signed by Sonny Tran. Furthermore, Nga Tran admitted at trial to receiving prior warnings from

-18-

distributors about large-scale pseudoephedrine sales; as a result, the exhibit could hardly be prejudicial to her.

Second, after discovering the jury had been sent the extraneous document, the district court gave a curative instruction. We generally presume that curative instructions are followed, *United States v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989), and, on this record, there is no basis to conclude that the jury disregarded the court's instruction and considered the document (assuming they saw it) in reaching their verdicts.

Finally, the court took important additional steps to ensure the document did not influence the jury's deliberations. After the verdicts were returned, the court polled the jury, focusing on whether there had been any actual prejudice from exposure to the *document*. The court inquired of the jury as follows:

> Ladies and gentlemen of the jury, I have a couple of questions to ask of you . . . Did you in any way consider Government's Exhibit No. 11 during your deliberations in reaching a verdict as to each of the Defendants?

Tr. at 280-81. Responding to a juror question, the court further explained that Exhibit 11 was "the exhibit that I sent the instruction back in, asking you to disregard or not to consider, . . . whether or not, in reaching your deliberations, you considered that exhibit." Tr. at 281-82. The district court then polled each juror, and all denied considering Exhibit 11 in reaching a verdict.

-19-

Accordingly, we are satisfied that the court did not err in denying the motion for mistrial.

## C.  Cumulative Error

Finally, Sonny Tran argues that the panel should reverse based on cumulative error.  "Cumulative error is present when the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error."  *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003).  Given that no error occurred in this case, we will not reverse on grounds of cumulative error.

## D.  Sentencing Issues as to Muessig

Muessig was sentenced to 33 months.  Her presentence report recommended an upward adjustment to her sentence for obstruction of justice, which would have moved her total offense level from 18 to 20, with a sentencing range of 33 to 41 months.  However, she objected to the adjustment and contended that the correct offense level was 18, with a sentencing range of 27 to 33 months.  She also filed a motion requesting a downward departure based on, among other things, her lack of education and good employment record, the overly aggressive conduct of the undercover officer in investigating her, and cultural factors.  At the sentencing hearing, the district court declined to apply the upward adjustment recommended by the PSR, and also declined to apply the requested downward

departure, yielding a total offense level of 18 and a Guidelines range of 27 to 33 months. The court sentenced her to the high end of the applicable range.

After oral argument in this case, the Supreme Court issued its decision in *United States v. Booker,* 125 S. Ct. 738 (2005), which declared unconstitutional the mandatory application of the United States Sentencing Guidelines. Muessig argues she is entitled to resentencing pursuant to *Booker.* Since Muessig did not make any objection to the mandatory application of the Sentencing Guidelines below, we review for plain error. *See United States v. Gonzalez-Huerta*, 403 F.3d 727, 729 (10th Cir. 2005) (en banc).

To establish plain error, Muessig must demonstrate that the district court (1) committed error, (2) that the error was plain, and (3) that the plain error affected her substantial rights. *United States v. Cotton*, 535 U.S. 625, 631 (2002). If all these conditions are met, we may exercise our discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Cotton*, 535 U.S. at 631-32.

With respect to the first two prongs, there is no question the district court committed actual error by operating under the erroneous assumption that the Guidelines were mandatory. *See United States v. Dazey*, 403 F.3d 1147, 1174-75 (10th Cir. 2005). Regarding the third prong, Muessig must demonstrate "a reasonable probability that, but for the error claimed, the result of the proceeding

would have been different." *Gonzalez-Huerta*, 403 F.3d at 733.  This showing can be made in a variety of ways, including establishing that without the constraints of the Guidelines, there is a reasonable probability the district court would have imposed a sentence outside the applicable Guidelines range.  *See United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005).  Our cases have examined several circumstances in assessing this element, including (1) whether there is a "disconnect" between the § 3553(a) factors and the sentence, *see United States v. Clifton*, 406 F.3d 1173, 1181 (10th Cir. 2005), or (2) whether the district court expressed dissatisfaction with the mandatory Guidelines.  *See Gonzalez-Huerta*, 403 F.3d at 735.

Applying these considerations here, we find no disconnect between the § 3553 factors and the sentence.  Muessig makes no showing that her sentence of 33 months is out of line with that of similarly situated defendants.  *See United States v. Dalton*, 409 F.3d 1247 (10th Cir. 2005).  The second consideration, the court's "dissatisfaction with the mandatory Guidelines," also does not weigh in Muessig's favor.  At the sentencing hearing, the district court specifically declined to employ the downward departure suggested by Muessig, stating "the court has carefully considered each and every one of the bases that you have alleged on behalf of Ms. Muessic [sic] for departing downward.  And the court finds that there are no facts in this case in any of those respective areas that

would remove this case out of the heartland of cases to justify this court departing downward." Sent. Tr. 7-8. The court then proceeded to sentence Muessig at the top of the applicable range. Given the absence of any reason to believe the district court was inclined to grant Muessig a different sentence outside the Guidelines range, Muessig cannot meet the third prong of plain error review.

Even if the record were clearer on this point, for us to notice plain error a defendant must also meet the fourth prong of the analysis, namely, whether the *Booker* error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Gonzalez-Huerta*, 403 F.3d at 734. "Our analysis under this fourth prong when an error is non-constitutional is not flippant or perfunctory; the standard is formidable, as we will only exercise our discretion when an error is particularly egregious and the failure to remand for correction would produce a miscarriage of justice." *Trujillo-Terrazas*, 405 F.3d at 820 (internal citations omitted). This demanding standard is not met here. Muessig's sentence is well within the national norm for her conduct as established by the Sentencing Guidelines, and the district court appeared satisfied that the sentence was appropriately tailored to her personal characteristics and the conduct for which she was convicted.

## III. Conclusion

For the foregoing reasons, we affirm the convictions of Muessig, Sonny Tran and Nga Tran.