FILED
United States Court of Appeals
Tenth Circuit

November 28, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ANTHONY DANIELS,

    Defendant - Appellant.

No. 17-1380
(D.C. No. 1:17-CR-00047-RM-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **O'BRIEN**, and **CARSON**, Circuit Judges.
_____

Anthony Daniels was indicted and went to trial on a single count of being a

felon in possession of a firearm. *See* 18 U.S.C. § 922(g)(1). During deliberations, a

juror shared extraneous information with the rest of the jury about the manner in

which her husband stored his gun. Mr. Daniels moved for a mistrial, but the district

court polled the jury, determined there was no prejudice, and denied the motion. The

court then excused the juror in question and instructed the remaining jurors to base

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

their decision solely on the evidence presented at trial. After further deliberation, the jury reached a unanimous guilty verdict, and the court sentenced Mr. Daniels to 63 months in prison. He appeals, claiming the court should have declared a mistrial. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Mr. Daniels' conviction.[1]

I

Mr. Daniels was stopped shortly after 11:00 PM on November 29, 2016, by Aurora, Colorado police officers Doug Pearson and Eugene VanDyk. He was driving a 1982 Chevy El Camino bearing collector vehicle license plates. As the officers approached the car, it lurched forward several feet, requiring the officers to yell to the driver to stop. The driver, Mr. Daniels, opened the driver's side door as he spoke on the phone and asked Officer Pearson if he could move the car. Officer Pearson said he could not and repeatedly ordered him to turn off the ignition. Meanwhile, Officer VanDyk, who approached from the passenger side, observed a handgun—a .380 Hi-Point—wedged between the passenger armrest and the passenger seat, with the muzzle pointed forward and up. Relevant to our purposes, it was later determined that the gun was loaded and contained one live round in the chamber. Upon seeing the weapon, Officer VanDyk yelled, "[T]here's a gun right there." R., Vol. 3 at 84, line 24; *id.* at 107, line 12. Mr. Daniels then looked down and to the right, where the gun was located. At that point, Officer Pearson, who was approaching on the driver's

---

[1] Mr. Daniels' appellate counsel withdrew after filing his opening brief. We granted Mr. Daniels leave to file a pro se supplemental brief, but his pleading, entitled, "Bill of Equity," is unintelligible, as is his pro se reply brief. Because we cannot act as his attorney, we do not consider his pro se materials any further.

side, forcibly removed Mr. Daniels from the car.  Mr. Daniels never denied owning the gun or knowing it was in the car.  Instead, he told the officers he was a sovereign citizen who had the right to arm and protect himself.

At trial, the government had to prove the essential elements of a § 922(g)(1) violation, which "are:  (1) the defendant was convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce," *United States v. Griffin*, 389 F.3d 1100, 1104 (10th Cir. 2004). The parties stipulated to the first element, and the government presented undisputed evidence for purposes of the third element that the gun had traveled in and affected interstate commerce.  Thus, the principal dispute was the second element and whether Mr. Daniels knowingly possessed the gun.

The defense theory was that Mr. Daniels did not knowingly possess the gun and that it belonged to his adult son, Elijah.[2]  Elijah testified on direct examination that the weapon belonged to him and he accidently left it in the El Camino after borrowing the car that day.  He explained that guns and cars were his hobbies, he owned three handguns, including the .380 Hi-Point, and he held a concealed-carry permit.  He said he often went to the firing range to practice shooting his guns and he always kept his guns loaded with one round in the chamber.  Further, Elijah testified that the El Camino would be his "baby" when his father restored it.  *Id.* at 287, line 13; *id.* at 288, lines 9-11.  He told the jury that he frequently borrowed the car and

---

[2] We use Elijah's first name to distinguish him from his father, who shares the same last name.

3

drove it earlier the day his father was arrested. Although he did not know his father's address and could not identify the name of his father's apartment complex where he picked up the car, he stated that whenever he drove the El Camino, he "stuffed" his gun "between the center column and the seat" so it would not move. *Id.* at 295, lines 8-10. Elijah testified that he had the gun in the car that day, when his father called and said he needed the car back so he could help Elijah's grandfather. According to Elijah, "[i]t was such a rushed situation," he dropped off the El Camino for his dad, picked up his green Ford Expedition, and continued with his day, not noticing the gun was gone. *Id.* at 297, lines 1-3, 15-16.

On cross-examination, Elijah confirmed that his training for a concealed-carry permit covered the safe handling of firearms, including loaded and unloaded guns. He emphasized, however, that the way he kept the gun in the El Camino was his own personal preference. He repeated, "I put it barrel up, stashed right between the center column and the passenger seat, and it was always loaded. It's always a full clip and always one in the chamber[], always." *Id.* at 303, lines 5-7. Counsel for the government asked Elijah to describe the center column in the El Camino, to which Elijah replied, "I guess [it] would be between the driver's seat and the passenger seat, whatever is in the way there[.]" *Id.*, lines 9-11. He said the center console was right next to the driver and "it's leather, you can open it, you can stuff my change, you know what I mean, my toys, my kids['] toys." *Id.* at 304, lines 4-5. Elijah continued to testify that the center console had a "lid" on it and he could "just pop it open." *Id.* at 304, lines 21-22; *id.* at 305, line 3. He testified that he could have stored the gun

4

in the center console, but he chose not to because it would have moved around, just as it did in the center console of his Expedition. He testified that he did not want the gun to move because it had a sensitive safety that would deactivate if he "bl[e]w on it." *Id.* at 306, lines 2-3.

On further cross-examination, Elijah conceded there was no evidence he borrowed the El Camino the day his father was arrested. He also conceded he did not know where he drove the car that day, he did not know the address where he dropped it off, and he did not know the time he left it for his father. Additionally, he could not recall what was in the back of the car, nor did he know when he discovered that the gun was missing, although he acknowledged it was a long time after the arrest. On redirect, defense counsel attempted to rehabilitate Elijah's testimony, in particular his testimony about the El Camino's center console. Defense counsel showed him a photo of the car's interior and pointed to what Elijah described as the center console of the car, asking, "Do you see a place right there where you can actually put change or anything?" *Id.* at 329, lines 5-6. Elijah replied, "Yeah, little zipper right there." *Id.*, line 7. Defense counsel clarified, "That zipper and stuff?" *Id.*, line 10. Elijah replied, "Yeah," to which defense counsel responded, "Okay. Good enough." *Id.*, lines 11-12. During summation, however, the government cited this testimony and argued that the zipper identified by defense counsel was actually the zipper to the upholstery of the seat's armrest and there was no center console in the El Camino.

The case went to the jury, and after the first day of deliberations, the district court advised the jurors not to discuss the case with spouses or anyone else. *Id.* at

5

424-26. The next day, however, the court received a note from a juror indicating that another juror shared extraneous information with the jury. According to the note, a juror asked her husband "if his gun in their safe was loaded with on[e] bullet in the chamber?" *Id.*, Vol. 2 at 17 (internal quotation marks omitted). The juror's husband replied, "No, never! Why?" *Id.* (internal quotation marks omitted). The note concluded, "I feel this to be a disregard for your instruction and rules. I felt she was talking about the case." *Id.*

The district court stopped deliberations and informed counsel on both sides that it could either declare a mistrial or individually poll the jurors to determine whether they were aware of the extraneous information and whether they could continue deliberations without prejudice to Mr. Daniels. The defense moved for an immediate mistrial, but the court deferred ruling on the motion until after it questioned the jury. Most of the jurors confirmed hearing the extraneous information but all of them confirmed it would have no impact on their decision. Thus, the court denied the motion for a mistrial, concluding there was no prejudice to Mr. Daniels. The court then excused the juror who introduced the extraneous information and instructed the remaining jurors to disregard it and base their verdict solely on the evidence presented during the trial. After resuming deliberations, the jury unanimously found Mr. Daniels guilty.

II

We review the district court's denial of a motion for mistrial for an abuse of discretion. *United States v. Day*, 830 F.2d 1099, 1103, 1106 (10th Cir. 1987). The

6

Sixth Amendment guarantees a criminal defendant the right to a "'public trial[] by an impartial jury.'" *United States v. Scull*, 321 F.3d 1270, 1278 (10th Cir. 2003) (quoting U.S. Const. amend. VI). "When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of prejudice, if any, to the defendant." *Id.* at 1280 (internal quotation marks omitted). This circuit "has developed two different standards to assess the impact of exposure to extraneous material on a jury." *United States v. Muessig*, 427 F.3d 856, 865 (10th Cir. 2005) (ellipsis and internal quotation marks omitted). Under one standard, "a new trial is appropriate if the slightest possibility exists that the exposure to extraneous material affected the verdict." *Id.* (internal quotation marks omitted). Under the second standard, "jury exposure to extraneous information creates a presumption of prejudice which may be rebutted by a showing that the exposure was harmless." *Id.* (internal quotation marks omitted).

We need not decide which standard to apply in this case because under either standard, the extraneous information was harmless. As an initial matter, the information that the juror's husband never stored his gun with a round in the chamber was not probative of the principal issue before the jury—*viz.*, whether Mr. Daniels possessed the gun recovered from the El Camino. Of course, there is an inference that the gun belonged to Elijah because it had a round in the chamber and he testified that he always stored his guns with a round in the chamber, but this inference is unnecessary, or at least redundant, because Elijah expressly testified that the gun was

7

his. The true relevance of the information, as Mr. Daniels contends, goes to Elijah's credibility and whether a reasonable gun owner would have stored the weapon as he did. For the reasons discussed below, we conclude that Elijah's credibility was materially undermined, not by the extraneous information, but by his own incredible testimony.

First, Elijah told the jury he took a concealed-carry course that covered the safe handling of firearms, yet he emphasized that his personal preference was to stash the gun between the El Camino's center console and the passenger seat, loaded with a round in the chamber and the muzzle pointing forward and up, notwithstanding a safety that he said would deactivate if he blew on it. The jury could have easily found it irreconcilable that he took a concealed-carry course and yet stored the gun in such a reckless fashion.

Second, after repeatedly testifying that he stored the gun between the El Camino's center console and the passenger seat, Elijah described the center console, saying it had a zipper and lid that could pop open, he could store the gun in it, and he could put his children's toys inside it. He testified that he chose not to keep the gun in the center console because it would move around too much. Defense counsel attempted to rehabilitate this testimony and accepted as "[g]ood enough" Elijah's statement that the center console was the "zipper and stuff," R., Vol. 3 at 329, lines 10-12. Nevertheless, the jury saw photos of the car's interior, *see, e.g.*, Supp. R. (Gov't Ex. 1 at 3-7), and could have credited the government's position that there was no center console in the El Camino. This would have undermined Elijah's

8

entire testimony that he drove the car frequently, intentionally stored the gun between the center console and the armrest, and accidentally left it in the car the day his father was arrested.

Third, there were numerous gaps in Elijah's testimony. He did not know where his father lived or where he picked up the El Camino, which he claimed was his "baby," *id.* at 287, line 13, that he "always [took] for a ride," *id.* at 321, lines 3-4, nor could he identify the name of the apartments where his father lived. Likewise, he did not know where his grandfather lived, he could not remember where he drove the car the day his father was arrested, and he could not recall the time or place he left the car. Moreover, he could not say for sure what he did afterwards, he did not know what, if anything, was in the back of the El Camino, and he did not know when he discovered that his gun was missing. These and other holes in his testimony, coupled with the significant inconsistencies discussed above, provided ample reason to discredit Elijah's testimony. Consequently, the extraneous information did not appreciably undermine his credibility, and even if it did, it merely provided a cumulative basis for doing so. Thus, the jury's exposure to the extraneous information was harmless. *See Muessig*, 427 F.3d at 865 (concluding that jury's exposure to cumulative extraneous material was harmless).

Notwithstanding Elijah's lack of credibility, there are other reasons why the extraneous information was harmless. After the district court excused the juror who provided the information, the court instructed the remaining jurors not to consider it. The court reiterated that they were not permitted to engage in independent

9

investigation and must base their decision solely on the evidence presented at trial. "We generally presume that curative instructions are followed." *Id.*

Also, there is overwhelming evidence of Mr. Daniels' guilt. *See United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir. 1988) ("[T]he presumption [of prejudice] is overcome by the overwhelming evidence of defendant's guilt . . . ."). It is undisputed that the gun was inside the El Camino and in close proximity to Mr. Daniels when he was stopped. When Officer VanDyk yelled that there was a gun, Mr. Daniels looked down and to the right, directly to where the gun was located. And after he was removed from the car, rather than deny knowing that the gun was in the car or deny that it was his, he told the officers he was a sovereign citizen who had the right to arm and defend himself. Given this evidence, the jury could have reasonably rejected his theory of defense and convicted him of the count charged in the indictment.

Mr. Daniels offers one final argument: he contends the district court applied the wrong test to determine the prejudicial effect of the extraneous information. He says the court improperly polled the jurors for their subjective impressions of the extraneous information but should have instead objectively evaluated its true prejudicial impact. This argument confuses the governing legal standards.

To prevent impeachment of jury verdicts, Federal Rule of Evidence 606(b) prohibits jurors from testifying, post-verdict, about the subjective effect of extraneous information on their decision. *Hornung*, 848 F.2d at 1044-45 & n.3. In that situation, the trial court is limited to an objective inquiry into the nature and

10

circumstances of the juror's exposure to the extraneous information to assess its prejudicial effect. *Id.*

Here, however, the court questioned the jury *before* it reached a verdict. Thus, Rule 606(b) was inapplicable and nothing prevented the court from inquiring into whether the jurors heard the extraneous information, what they understood it to mean, and what impact, if any, it would have on their impartiality. As we have explained:

> It is one thing to prohibit a juror from testifying directly about the effect of outside contacts on jury deliberations leading to a verdict, and entirely another to permit a juror to appear at a pre-verdict . . . hearing and to give testimony relative to what an improper contact statement meant or imparted to the juror and whether the statement affected his or her impartiality.

*Day*, 830 F.2d at 1105 (citations omitted). In this case, the district court properly inquired into the jurors' understanding of the extraneous information and obtained their individual reassurances that it did not affect their impartiality. We therefore conclude that the court did not abuse its discretion in denying the motion for a mistrial.

III

The judgment of the district court is affirmed.

Entered for the Court

Jerome A. Holmes
Circuit Judge

11