**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KEITH SCHWARTZ, a/k/a Bernie Kype,

    Defendant - Appellant.

No. 15-1162
(D.C. No. 1:13-CR-00218-JLK-2)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **BACHARACH**, Circuit Judges.
_____

    Defendant Keith Schwartz operated a pain-management clinic that prescribed opioids outside the usual course of medical practice. For his role in that operation, a jury convicted Schwartz of various counts related to unlawful drug distribution and money laundering, and the district court imposed a fifteen-year prison sentence. Schwartz attacks both his convictions and sentence. He argues first that the jury was irreparably tainted, even before the trial began, when the court accidentally revealed that Schwartz had prior felony convictions. Next, he challenges several evidentiary decisions by the district court. Finally, he takes issue with his sentence, which was

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

based on all the pills dispensed by the clinic, rather than merely the number of pills affirmatively proved to be illegitimate.  We AFFIRM on all issues.

## I.    BACKGROUND

### A. Unlawful Distribution of Prescription Narcotics

The operation began as a medical marijuana business in 2009, with Schwartz managing the business and Dr. Joseph Ferrara writing the medical marijuana prescriptions.  In May 2011, however, a new opportunity presented itself.  Another physician, Dr. Kevin Clemmer, had recently been arrested for unlawfully distributing prescription drugs as part of his pain-management practice.  Schwartz then took over the practice, including Clemmer's former patient base, and transitioned the focus of his business from medical marijuana to prescription narcotics.  Schwartz remained manager of the practice and Ferrara was responsible for seeing patients and writing prescriptions.

To kick off the new practice, Schwartz arranged for his staff to meet with Clemmer's former patients in a hotel conference room.  That day was described as "chaos," as Ferrara prescribed over 5,000 dosage units to patients, most of whom received new prescriptions even though some did not bring their medical records and Schwartz's team did not have any of the records from Clemmer's office. Over the course of the next year and a half, Ferrara prescribed around 500,000 pills of Oxycodone, around four times the typical volume for a pain-management practice

2

with three or four providers. As the district court put it, the operation was "a pill mill, pure and simple." Vol. III at 2630.

The jury found that Schwartz's pain-management practice was in fact an illegal drug-distribution operation because it issued prescriptions outside the usual course of medical practice.[1] Not only did the practice dispense opioids at a volume significantly higher than the national standard for safe consumption, it did so sometimes without obtaining full medical records or conducting adequate patient evaluations. Further, the practice prescribed pills while ignoring its own policies for monitoring drug abuse by its patients, overlooking positive drug screens and prescribing pills anyway, and disregarding indicators of addictive behavior. During this time period, two patients who had exhibited severe drug-seeking behavior died of drug-overdose while under the care of Schwartz's clinic.[2]

The United States indicted Schwartz for conspiracy to distribute controlled substances, unlawful distribution of those substances, using a telephone to facilitate the conspiracy, money laundering, and conspiracy to commit money laundering. A jury trial ensued.

---

[1] Distributing a controlled substance is illegal unless the distributor is a physician prescribing such substances in the usual course of medical practice. See United States v. Moore, 432 U.S. 122, 124 (1975); 21 C.F.R. § 1306.04. So the question at trial was whether the pain-management practice conformed to standard, accepted medical norms.

[2] The United States did not ultimately allege that the patients died because of Schwartz's unlawful conduct, and the jury received a limiting instruction cautioning them not to infer such causation.

3

**B.  Pre-Trial Jury Instructions**

After jury voir dire, the newly selected jurors left the courtroom at 10:17 a.m. on the morning of trial.  The court then recessed from 10:20 to 10:49 a.m.  Sometime either during that recess or immediately after court reconvened, the district judge gave the jurors a written copy of the jury instructions and began reading those instructions aloud.  In the jury packet, however, the district court had inadvertently and improperly included two instructions that were previously prepared by the parties for use after trial.  First, Instruction No. 16 begins: "You have heard evidence that Keith Schwartz has been *convicted of a felony*, that is, a crime punishable by imprisonment for a term of years."  Vol. I at 653 (emphasis added).  Second, Instruction No. 19 begins: "You have heard evidence of *other crimes, wrongs or acts* engaged in by Mr. Schwartz."  Vol. 1 at 655 (emphasis added).

The district court did not notice its mistake until after it began to read aloud from Instruction No. 16 when it said, "You have heard evidence that Keith Schwartz—this shouldn't be in here."  Vol. III at 45.  The district judge then had the courtroom deputy retrieve that instruction from the jurors and directed the jury to "disregard this instruction entirely."  Id.  The court continued reading until it reached Instruction No. 19 and stated, "You will hear evidence of other crimes— . . . ."  Id. at 46.  The judge again paused, told the jury to "disregard" the instruction and had the deputy remove it.  Id.  It is not clear from the record whether any jurors actually read the instructions contemporaneously with the district court's out-loud articulation, but

4

Schwartz's counsel stated he believed that thirty to sixty seconds elapsed before the deputy retrieved the erroneous instructions from the jurors.

After the jury was dismissed, Schwartz's counsel moved for a mistrial based on the erroneous inclusion of these instructions. Satisfied that its curative efforts were sufficient to mitigate any prejudice caused by the mistake, the district court denied the mistrial motion. After the trial, Schwartz asked for a new trial on the same grounds, but the district court denied the new-trial request.

## C. **Trial Testimony**

During the trial, the court admitted testimony on three subjects which Schwartz now challenges on appeal. First, Schwartz contends that the testimony regarding the deceased patients was improper evidence of prior bad acts and also impermissibly prejudiced the jury. Second, Schwartz argues that the testimony regarding the precursor medical marijuana business should have been excluded because it was impermissible evidence of prior bad acts and excessively prejudicial. Third, Schwartz challenges the admission of testimony from his ex-wife, Lauren Schwartz (Lauren), whom the government called as a witness. After cross-examination by the defense, the government proceeded on redirect examination to impeach Lauren, attempting to show that she did not know Schwartz as well as she purported to know him. The government asked Lauren if she knew about Schwartz's criminal history, listing a series of offenses for which Schwartz had previously been charged. This line of questioning asked only about "charged" offenses, not

convictions. Schwartz asserts on appeal that this testimony was impermissible evidence of prior bad acts, as well as improper impeachment.

## D. **Sentencing**

After an eleven-day trial, the jury convicted Schwartz of various counts. At sentencing the district court calculated the offense level under the Sentencing Guidelines based on the weight of the total volume of prescribed pills. Schwartz objected on the ground that the calculation should have included only those prescriptions which the government affirmatively proved to be illegitimate. However, the district court disagreed, holding that *all* prescriptions written during the course of the conspiracy were illegal because the entire enterprise was illegal, and any activity that furthered the criminal enterprise was relevant conduct for the calculation of the sentence. The district court then arrived at a guideline range of 360 months to life, but varied downward and sentenced Schwartz to 180 months' imprisonment.

## II.    DISCUSSION

### A. **Pretrial Inclusion of Instructions on Prior Felony Convictions in Juror Notebooks**

The principal issue in this appeal is whether the district court abused its discretion in denying a mistrial or new trial after inadvertently informing the jury about Schwartz's previous wrongful acts and a prior felony conviction. We conclude

that the inclusion of these pre-trial jury instructions was harmless, so the district court did not abuse its discretion in denying a mistrial or new trial.

The Tenth Circuit has developed two competing standards for determining the impact of exposure to extraneous material on a jury. Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1241 (10th Cir. 2000). Under the first approach, a new trial is warranted when the aggrieved party shows that there is the *slightest possibility* that the exposure affected the verdict. Id. According to the second standard, however, a court will *presume prejudice* and grant a new trial unless the government can show the exposure was harmless. Id. The primary difference between these conflicting approaches lies in which party has the initial burden of proof. Id. at 1241-42.

There may be some future occasion to resolve this intra-circuit tension, but not today. We have repeatedly declined to resolve this conflict in cases where its resolution would make no difference in the outcome. United States v. Muessig, 427 F.3d 856, 865 (10th Cir. 2005) ("[W]e need not resolve these different approaches in this appeal" because "[u]nder either standard, we find that the exposure here was harmless."); Ingersoll-Rand, 214 F.3d at 1242 ("Having identified this bifurcation in our case law, judicial discretion dictates that we leave its ultimate resolution for another day."). Once again, it is not necessary for this panel to choose which articulation to follow because the outcome of this case does not depend on which rule applies. Therefore, as in both Ingersoll-Rand and Muessig, we decline to resolve this uncertainty.

Under either standard, in determining the harmlessness of extraneous material revealed to a jury, we require the trial court to assess the possibility of prejudice by 'reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware.'" Ingersoll-Rand, 214 F.3d at 1242 (quoting United States v. Hornung, 848 F.2d 1040, 1045 (10th Cir. 1988)).  After reviewing this record and examining the district court's decision for abuse of discretion, United States v. Morgan, 748 F.3d 1024, 1041 (10th Cir. 2014), we determine that the inadvertent inclusion of these pre-trial jury instructions was harmless.[3]

At the outset, we presume the jurors here read the extraneous jury instructions either as the district judge read them aloud or beforehand.  The record does not establish precisely when the jurors received the booklet of written instructions—it could have been during the recess or immediately thereafter.  However, the record does suggest that up to a full minute may have elapsed after the district court called attention to its mistake before the courtroom deputy retrieved the erroneous

---

[3] Schwartz contends this was structural error because revealing his criminal history deprived him of his presumption of innocence.  Structural error would mandate reversal without any inquiry into harmlessness.  But we do not characterize this error as structural—or even constitutional—simply because it involved the revelation to the jury of past criminal conduct.  Our case law instead requires us to analyze the harmlessness of revealing to a jury prior felony convictions of the defendant.  See United States v. Wacker, 72 F.3d 1453, 1471-74 (10th Cir. 1995) (finding the disclosure of the details of prior convictions to be harmless in light of the overwhelming evidence of guilt); United States v. Hall, 625 F.3d 673, 681-82 (10th Cir. 2010) (finding the disclosure of prior convictions during jury voir dire to be harmless).  Because we are not aware of any case to the contrary, we reject the invitation to deem this structural error.

instructions from the jurors, during which time the improper instructions were in the jurors' possession. That is enough time for at least one curious juror to look down and see what all the fuss was about, and then read the extraneous instructions in their entirety.

Even assuming the jurors did read the erroneous instructions, that exposure was harmless on this record. As for Instruction No. 19, which stated that Schwartz had engaged in "other crimes, wrongs or acts," that information was admitted properly later in the trial when the government elicited evidence of Schwartz's prior criminal charges, and the district court in fact read aloud the exact same instruction post-trial without any objection by Schwartz. Thus, Instruction No. 19 was not really "extraneous" at all—it did not reveal anything that the jury was not already going to hear. Thus, the erroneous inclusion of Instruction No. 19 was harmless.

Instruction No. 16, which stated Schwartz had been "convicted of a felony," was also harmless because of various mitigating considerations, as well as the ample evidence of Schwartz's guilt. Prejudice was mitigated in several ways. First, the district court offered several curative instructions which juries are presumed to follow. Morgan, 748 F.3d at 1041-42. When the district court initially discovered its mistake, it expressly directed the jury to disregard the error. At the end of the trial, the court again instructed the jury to "completely ignore" everything that the judge had earlier ordered them to disregard. Vol. III at 2177. And before dismissing the jury, the district court individually polled each juror to ensure that the verdicts were not based on any information which they were ordered to disregard.

9

Second, the jury's exposure to this material was "one short moment" in an eleven-day trial. See Morgan, 748 F.3d at 1041 (upholding the denial of a mistrial when the jury's potential exposure was "one short moment in a seven-day trial"). Third, because this error occurred before opening statements, the jury here likely lacked sufficient context for the mistake to make any lasting prejudicial impression. At that point, no evidence had been presented, the parties' narratives had not been told, and deliberation did not begin for another two weeks. Fourth, any potential prejudice was at least mitigated, even if not extinguished, when the jury later heard evidence about Schwartz's prior criminal *charges*, and the incremental impact of an unspecified *conviction* is not sufficiently prejudicial for us to find an abuse of discretion in denying the motions for mistrial and new trial.

In addition to these mitigating considerations, the substantial evidence of Schwartz's guilt presented at trial confirms our conclusion that this error was harmless. There was ample evidence that Schwartz was knowingly distributing controlled substances outside the usual course of medical practice. To begin, he kicked off his pain-management clinic by taking over the patient base of a doctor who was arrested for unlawfully distributing pain pills. Then the practice prescribed pain pills sometimes without adequate medical records or patient evaluations and to some patients who failed drug tests. On occasion, the clinic ignored signs of drug addiction and prescribed pills anyway, and then further failed to monitor patients for drug abuse. Furthermore, the clinic dispensed opioids at a volume far exceeding the normal amount for a typical pain-management practice.

10

With this evidence of guilt, coupled with the various factors that would have alleviated any prejudice, we find that the erroneous inclusion of these jury instructions was harmless.

**B. <u>Admission of Testimony Regarding Deceased Patients, Precursor Marijuana Operations, and Prior Criminal Charges</u>**

We turn next to Schwartz's evidentiary challenges to testimony admitted during trial. On appeal, he challenges the admission of testimony addressing: (1) patients who died while under his clinic's care; (2) the precursor medical marijuana operation; and (3) his prior criminal charges. Reviewing evidentiary rulings such as these for abuse of discretion, <u>e.g.</u>, <u>United States v, McGlothlin</u>, 705 F.3d 1254, 1260 (10th Cir. 2013), we address each subject in turn.

      1. <u>Deceased Patients</u>

Schwartz contends that the evidence of deceased patients violated Rules 404(b) and 403 of the Federal Rules of Evidence. Rule 404(b) bars the admission of prior bad acts to show that a person acted in accordance with a particular character trait. Fed. R. Evid. 404(b). More generally, Rule 403 permits a court to exclude evidence that is substantially more prejudicial than probative. Fed. R. Evid. 403.

As an initial matter, Schwartz waived his argument under Rule 404(b) by failing to preserve it in the district court, and then by neglecting to argue for the application of plain error on appeal. <u>See</u> <u>United States v. Fisher</u>, 805 F.3d 982, 992 (10th Cir. 2015) (finding a new appellate argument waived when the party failed to argue for the application of plain-error review). Furthermore, even if this argument

11

were not waived, it is does not overcome plain-error review because the admission of this evidence was not plainly erroneous. Rule 404(b) does not preclude the admission of other-act testimony when the other act is intrinsic to the charged offense. See, e.g., United States v. Kupfer, 797 F.3d 1233, 1238 (10th Cir. 2015). We have sometimes referred to this principle as *res gestae*—evidence that is "part and parcel of the proof of the offense charged in the indictment." United States v. Ford, 613 F.3d 1263, 1267 (10th Cir. 2010)  In this case, the testimony regarding the deceased patients was inextricably connected to the charged offenses because it was offered to help prove that prescriptions written to those patients were unlawful and not consistent with accepted medical norms. Thus the Rule 404(b) argument fails.

Schwartz's Rule 403 argument, although not waived or forfeited, shares a similar fate. Evidence of patient deaths was probative of the conspirators' wanton disregard for the drug-abusive tendencies of its patients. It showed that Schwartz knew that the clinic's patients were misusing their prescriptions, yet the practice continued to prescribe opioids in irresponsible ways. Furthermore, it is not unfairly prejudicial for the jury to know the consequences of a defendant's criminal behavior, especially when the district court gave a limiting instruction before and after trial, thereby alleviating any prejudicial effect.[4] We thus cannot say that the district court went beyond its wide range of discretion in admitting this evidence.

---

[4] The limiting instruction provided: "You may consider evidence of these deaths in your determination of whether the Government has proven the existence of a conspiracy to distribute controlled substances beyond the scope of professional practice and for a purpose other than a legitimate medical purpose beyond a

## 2.  Precursor Marijuana Operation

Schwartz argues similarly that the testimony regarding his precursor medical marijuana operation violated Rules 404(b) and 403.  We do not agree.  Again, this argument is waived because Schwartz did not object below and failed to argue on appeal for the application of plain error.  Fisher, 805 F.3d at 992.  Even if not waived, this argument is especially weak on the merits and thus cannot overcome plain-error review.

The Rule 404(b) charge fails because the medical marijuana operation itself was part of the specified unlawful activity underlying the money-laundering conspiracy charge.  It was thus not evidence of "other acts," but rather evidence of acts that are *part of* the charge of conviction.  As for the Rule 403 challenge, that too fails because the evidence was not sufficiently prejudicial.  The jury was informed that Schwartz' medical marijuana operation was legal under state law, and again was probative of the money-laundering charges.  We thus find no plain error with respect to these challenges.

## 3.  Prior Criminal Charges

Again under Rule 404(b), Schwartz challenges the admission of his prior criminal charges during the government's redirect examination of his ex-wife Lauren.  The government called Lauren as its own witness, and Schwartz's counsel cross-examined her.  During cross-examination, Lauren testified that Schwartz believed it

---

reasonable doubt.  *You may not consider whether the deaths of [these patients] were caused by the ingestion of controlled substances.*"  Vol. III at 43-44 (emphasis added); accord id. at 2181.

13

was important to do things "right" and "proper," Vol. III at 1325, would consult with lawyers to understand the legal aspects of his business ventures, and made efforts to understand applicable laws and regulations. On re-direct examination, the government questioned Lauren about how well she truly knew her ex-husband's tendency to follow the law. The government asked whether she knew about a series of prior criminal charges including grand larceny, grand theft felony, making a false or fraudulent insurance claim, and bank fraud felony. Lauren disclaimed awareness about most of these charges.

We reject Schwartz's Rule 404(b) challenge because that rule does not apply to impeachment evidence. E.g., United States v. Watson, 766 F.3d 1219, 1245 (10th Cir. 2014). The testimony of Schwartz's prior criminal charges was not elicited as substantive evidence to establish a fact in issue, but rather as impeachment evidence to challenge Lauren's credibility—it showed either that Lauren's testimony was overstated or that her knowledge of her ex-husband's law-abiding nature was more limited than she believed.

Further, there was nothing improper about this impeachment evidence. Questioning Lauren about her awareness of her husband's criminal past could have cast doubt on her earlier statements that she knew her ex-husband tended to follow the law. And even if this criminal history were somewhat prejudicial, the district court did not abuse its significant discretion in finding that the prejudicial effect did not "substantially outweigh[]" the testimony's probative value. Fed. R. Evid. 403. We thus decline to disturb the district court's exercise of its discretion in this matter.

14

**C. Calculation of Sentencing Guideline Range Based on Prescribed Pills**

The district court calculated the sentencing guideline range based on *all* the pills prescribed by Ferrara through the pain-management clinic, rather than only those pills which the government affirmatively proved to be illegitimately prescribed. Schwartz contends that even if some prescriptions were unlawful, some were not, and the district court cannot extrapolate from a snapshot of evidence about a few patients whose treatment regimens were analyzed at trial.

But the entire volume of pills were included not based on some inference that they all must have been illegitimately prescribed, but rather because the *entire* operation was illegal and operating outside of the usual course of medical practice, so *none* of the prescriptions could have been legitimate. In other words, the district court found that each individual prescription—even the lawful ones—advanced the criminal enterprise and furthered the conspiracy to operate a sham pain-management clinic. Reviewing the district court's factual finding for clear error, United States v. Sells, 541 F.3d 1227, 1235 (10th Cir. 2008), we conclude the district court did not clearly err in attributing the entire volume of prescribed pills to Schwartz for the purpose of calculating the sentencing guideline range.

## III.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court on all issues.

Entered for the Court

David M. Ebel
Circuit Judge

15

*United States v. Schwartz*, No. 15-1162
**BACHARACH**, J., dissenting.

At the start of Mr. Keith Schwartz's trial, the district court inadvertently provided the jury with an erroneous jury instruction. The instruction said that the jury had heard evidence that Keith Schwartz had previously been convicted of a felony. There was no such evidence presented, and Mr. Schwartz moved for a mistrial. This motion was denied.

Mr. Schwartz appeals that ruling. In this appeal the parties agree that the instruction was erroneous, but they disagree over the instruction's harmfulness. In my view, the erroneous instruction was deeply prejudicial, rendering the denial of a mistrial an abuse of discretion. Thus, I would reverse the conviction.

## I.     The district court erroneously instructed the jury that evidence showed that Mr. Schwartz was a convicted felon.

Mr. Schwartz managed a pain management center, where a doctor prescribed opioids and other drugs for patients. The government prosecuted Mr. Schwartz, alleging that the center served as an unlawful pill mill. The case went to trial.

After swearing in the jurors, the court took a 29-minute recess. During this recess, the court provided each juror with a packet of jury instructions. Unbeknownst to the court, however, the packets contained an

instruction that had been included by mistake.[1] The first sentence of the instruction stated: "You have heard evidence that Keith Schwartz has been convicted of a felony, that is, a crime punishable by imprisonment for a term of years." *See* R. vol. I, at 653; R. vol. III, at 45.[2]

After the recess ended, the court read aloud many of the jury instructions. When the court began reading the instruction about evidence of a prior felony conviction, the court realized that this instruction had been mistakenly included. The court stopped reading, asked the courtroom deputy to collect all copies of this instruction, and instructed the jurors to disregard the instruction.

Mr. Schwartz moved for a mistrial, arguing that the instructional error had prejudiced the jury. The court acknowledged the strength of Mr. Schwartz's argument but denied the motion for a mistrial. Ultimately, no evidence of a prior felony conviction was ever admitted.

---

[1]     A second jury instruction was also inadvertently included in the packet. The first sentence of this jury instruction referred to "evidence of other crimes, wrongs or acts engaged in by Mr. Schwartz." R. vol. I, at 655; *see* R. vol. III, at 46. Before the jury deliberated, this instruction was read without objection. Thus, for the sake of argument, I assume that any error related to this jury instruction would have been harmless.

[2]     Like the majority, I presume that the jurors read this instruction. Maj. Op. at 8.

2

## II.    The instructional error prejudiced the jury.

On appeal, Mr. Schwartz argues that he was entitled to a mistrial, and I agree.[3] Little doubt exists regarding the existence of an error, and the majority acknowledges that the instruction was erroneous. The only real issue is whether the error was prejudicial. I believe it was, for the jury instruction created the devastating impression that there was evidence of a prior felony conviction. *See* Alan D. Hornstein, *Between* Rock *and a Hard Place: The Right to Testify and Impeachment by Prior Conviction*, 42 Vill. L. Rev. 1, 1 (1997) ("If the jury learns that a defendant previously has been convicted of a crime, the probability of conviction increases dramatically."); L. Timothy Perrin, *Pricking Boils, Preserving Error: On the Horns of a Dilemma After* Ohler v. United States, 34 U.C. Davis L. Rev. 615, 651-52 (2001) (stating that "the admission at trial of a criminal defendant's prior convictions often spells doom for a criminal defendant" and that "[t]he available empirical data demonstrate that the admission of a prior conviction has an explosive impact on the jury, substantially increasing the likelihood that the jury will convict the defendant of the charged crime"). This impression tainted everything that the jury heard and saw over the course of the 11-day trial.

---

[3]    Because I would reverse on this ground, I do not analyze Mr. Schwartz's other appeal points.

3

### III. The Standard of Review and the Conflicting Standards for Whether a Mistrial Is Appropriate

The district court denied Mr. Schwartz's motion for a mistrial. That denial is reviewed for an abuse of discretion. *United States v. Morgan*, 748 F.3d 1024, 1041 (10th Cir. 2014).

Both parties agree that the court should not have given the jury instruction. The resulting issue is whether the district court abused its discretion by denying Mr. Schwartz's motion for a mistrial. On that issue, the government and the majority conclude that the denial of a mistrial fell within the district court's discretion because the error had been harmless.

The majority approaches harmlessness based on our case law involving exposure to extraneous information. I agree with this approach, for the jury instruction exposed the jury to information that was never presented in any of the evidence.

In assessing whether the jury's exposure to extraneous information was harmless, permitting the denial of a mistrial, we have employed two different standards. *United States v. Muessig*, 427 F.3d 856, 865 (10th Cir. 2005). Under the first standard, a mistrial is appropriate upon the "slightest possibility" that exposure to the extraneous information affected the verdict. *Id.* For this standard, the moving party bears the burden of proof. *See id.* Under the second standard, the jury's exposure to extraneous information creates a presumption of prejudice. *Id.* But the nonmovant may

rebut this presumption by showing that the exposure was harmless. *Id.* In my view, the instructional error could not be deemed harmless under either standard.

## IV. The Government's Harmlessness Argument

The government argues that

- the jury was exposed to the erroneous instruction for only a short period of time,

- the instructional error was rendered harmless by events unfolding at trial, and

- a poll following the verdict indicated that the error was harmless.

I would reject these arguments.

### A. The duration of the erroneous exposure was sufficient to cause prejudice.

The government contends that the error in this case was harmless because the jury's exposure to the erroneous instruction "'lasted mere seconds.'" Appellee's Ans. Br. at 17 (citation omitted); *accord* Maj. Op. at 10. For support, the government cites *United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014). There we held that allegedly prejudicial testimony was harmless, noting that the "testimony was one short moment in a seven-day trial." *Morgan*, 748 F.3d at 1041. I would reject the government's argument both as a matter of fact and as a matter of law.

First, as a factual matter, the exposure here did not necessarily transpire over just a few seconds. The record does not state exactly when

the jury was provided with the instruction packet; the record reveals only that the jury obtained the packet at some point during the recess. That recess lasted 29 *minutes*, during which the jury may have perused the contents of the packets.

Second, even if the jury had seen the instruction for only a few seconds, this would be only one factor to consider. The *Morgan* court relied on the combination of multiple factors, only one of which was the temporal length of the erroneous exposure. *Id*. at 1041-42. As discussed below, the unique facts of our case magnified the potential for prejudice. Based on these facts, I would find prejudice even if the duration of the exposure had lasted only a short period of time.

**B.      The curative instructions and the questioning of Mr. Schwartz's ex-wife did not render the instructional error harmless.**

In the government's view, the instructional error was rendered harmless by the district court's curative instructions and the government's questioning of Mr. Schwartz's ex-wife, which suggested that Mr. Schwartz had previously faced felony charges. I disagree.

**1.      The Curative Instructions**

The government contends that the district court cured the error by telling the jury to disregard the erroneous instruction, adding that at other points during the trial, the court instructed the jury to ignore anything that it had been told to disregard.

6

We ordinarily presume that juries follow instructions like these. *United States v. Morgan*, 748 F.3d 1024, 1042 (10th Cir. 2014). And as a general rule, these kinds of instructions are sufficient to avert prejudice. *Id.* at 1041-42. But there is a limit to what instructions can cure: "[W]here the character of [extrinsic evidence] is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case, although admonished to do so, a mistrial should be ordered." *See Maestas v. United States*, 341 F.2d 493, 496 (10th Cir. 1965).

For instance, in *Maestas v. United States*, we held that curative instructions were insufficient when the jury was exposed to the fact that the defendant had previously been imprisoned. 341 F.3d at 495-97. *Maestas* mirrors the present case and indicates that the curative instructions here were insufficient.

In *Maestas*, a governmental informant gave a nonresponsive answer in cross-examination, revealing that the defendant had previously been imprisoned. The defendant immediately moved for a mistrial. *Id.* at 495. The district court overruled the motion, struck the nonresponsive answer, and instructed the jury to disregard the answer. *Id.*

Shortly thereafter, the informant gave another nonresponsive answer, again revealing that the defendant had been imprisoned. *Id.* at 495-96. Again, the defendant unsuccessfully moved for a mistrial; but the court

7

again struck the nonresponsive answer and instructed the jury to disregard the answer. *Id.* at 496.

On appeal, we held that the district court had abused its discretion in refusing to grant a mistrial. *Id.* at 496-97. We reasoned that the jury must have been prejudiced by the informant's unresponsive answers. *Id.* at 496. We acknowledged the two curative instructions, but concluded that they could not have prevented the prejudice. *Id.* at 495-97.

The prejudice here is even greater than it was in *Maestas*. There the prejudicial information came from a governmental informant in the midst of the trial. Here the prejudicial information came at the start of the trial from the court itself. These differences magnify the impact of the prejudice in our case. Thus, *Maestas* would prevent reliance on the curative instructions to avert the prejudice to Mr. Schwartz.[4]

---

[4] In *Maestas*, the informant provided the jury with the extraneous information at two separate times. *See* pp. 7-8. But that fact does not distinguish *Maestas* from our case. As noted above, the jury here was provided with the erroneous instruction during the recess and could have read the instruction at least once. Then, the jurors could have read the instruction a second time when following along as the judge read the instructions aloud. Finally, after the judge announced that the instruction was to be collected, any juror whose curiosity had been aroused could have looked down and read the instruction for a third time. Thus, the jury could have been exposed to the improper information multiple times.

### a. The instructional error occurred at the start of Mr. Schwartz's trial.

The timing of the prejudicial information here differs from the timing in *Maestas*. The jurors in *Maestas* were initially able to impartially evaluate the evidence against the defendant. Problems arose only after the jurors learned that the defendant had served time in prison. From that point on, the prejudicial information tainted everything that the jurors saw and heard.

By contrast, the instructional error here occurred before the jury had even heard opening statements. The jury's first impression of Mr. Schwartz involved supposed evidence that he was a convicted felon. From the beginning, this prejudicial misinformation cast a shadow over everything that the jury saw and heard.

Scholarship confirms that this sort of first impression was particularly prejudicial. For example, scholars have recognized that individuals generally assign disproportionate weight to what they learn first. *See* Lawrence S. Wrightsman, *The Place of Primacy in Persuading Jurors: Timing of Judges' Instructions and Impact of Opening Statements*, 8 U. Bridgeport L. Rev. 431, 432 (1987) ("Social psychologists have recognized for a long time the importance of early information in the formation and maintenance of the impressions of others."). Jurors are no exception. The jurors' initial information about a defendant frequently

9

bears significantly on the outcome. *See id.* at 431 (arguing, based on studies, "that early information is very important in forming jurors' impressions of guilt or responsibility in trials and suits").[5]

In addition, scholars have recognized that a juror's mood, focus, and energy level normally change over the course of a trial. At the outset, jurors are generally "anxious, curious, receptive, and looking for someone to trust." Michael Frost, *Ethos, Pathos & Legal Audience*, 99 Dick. L. Rev. 85, 111 (1994); *see* Thomas A. Mauet, *Fundamentals of Trial Techniques* 42 (3rd ed. 1992); Ronald L. Carlson & Edward J. Imwinkelried, *Dynamics of Trial Practice: Problems and Materials* 110 (3rd ed. 2002). At this point, jurors "are also more likely to be interested and attentive." Michael Frost, *Ethos, Pathos & Legal Audience*, 99 Dick. L. Rev. 85, 112 (1994); *see* Ronald L. Carlson & Edward J. Imwinkelried, *Dynamics of Trial Practice* 110 (3d ed. 2002).

But as the trial continues, the jurors' focus and energy will generally decrease. By the end of the trial, the jurors "will be tired, perhaps bored, and occasionally confused." Michael Frost, *Ethos, Pathos & Legal Audience*, 99 Dick. L. Rev. 85, 112 (1994); *see* Lawrence S. Wrightsman, *The Place of Primacy in Persuading Jurors: Timing of Judges' Instructions*

---

[5] The district court acknowledged this tendency, telling the jurors that "[i]t's a natural tendency to develop an impression and then stay with it as you go along." R. vol. III, at 11.

10

*and Impact of Opening Statements*, 8 U. Bridgeport L. Rev. 431, 432 (1989) ("When observing a time-consuming event like a trial, attention tends to decrease over time because of such factors as boredom, distraction, fatigue, or simply an overload of information."). In this case, the trial lasted eleven days; the jurors were presumably the most focused, receptive, and energetic at the start, precisely when the jury was exposed to information suggesting that Mr. Schwartz was a convicted felon notwithstanding the absence of any such evidence during the trial.

The timing of the instructional error magnified its prejudicial effect, leaving Mr. Schwartz in an even deeper hole than the defendant in *Maestas*.

> **b.    The district court itself revealed the prejudicial information.**

*Maestas* also differs from our case with respect to the source of the prejudicial information. In *Maestas*, the prejudicial information came from a governmental informant. 341 F.2d at 494-96. As a result, the jurors could reasonably question the source of the information. *See On Lee v. United States*, 343 U.S. 747, 757 (1952) ("The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility."). Here the prejudicial information about Mr. Schwartz could not reasonably be questioned, for it came from the court itself.

* * *

In *Maestas*, a mistrial was necessary when the jury was exposed to the fact that the defendant had previously been imprisoned. Curative instructions were not enough to avert the prejudice. And the prejudice here was even greater than it had been in *Maestas*: The erroneous information here was revealed at the start of the trial by the district court. As a result, *Maestas* forecloses reliance on the curative instructions.

**2. The instructional error was not rendered harmless by the government's questioning of Mr. Schwartz's ex-wife.**

The government also argues that the instructional error was harmless because the jury eventually heard about felony charges during the government's questioning of Mr. Schwartz's ex-wife. In my view, this questioning did not render the instructional error harmless.

In questioning Mr. Schwartz's ex-wife, the government's questions suggested that Mr. Schwartz had been charged with various felonies. But, the government elsewhere downplays the impact of these questions, pointing out that the government "presented no independent evidence of the charges, and [Mr. Schwartz's ex-wife] did not confirm or refute them." Appellee's Ans. Br. at 51. Thus, the jurors could reasonably question whether Mr. Schwartz had even been charged with these felonies.

But let's suppose the jurors believed that Mr. Schwartz had previously been charged with other felonies. Even then, the instructional

12

error would not be harmless. A charge is merely an accusation. There is a vast, qualitative difference between an accusation of criminality and a finding of guilt. *Cf. Michelson v. United States*, 335 U.S. 469, 482 (1948) ("Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty."). Accordingly, the impression created by the questioning paled in comparison to the impression created by the instructional error. At most, the questioning suggested that Mr. Schwartz had been *accused* of felonies; the instruction gave the jury the impression that there was evidence of a prior felony *conviction*.

## C.    The district court's poll could not reliably indicate whether the jury was prejudiced.

After Mr. Schwartz was found guilty, the district court conducted a poll. In the government's view, this poll showed that the jurors had put the erroneous instruction aside. I disagree, for the poll was too vague and generic to reliably expose prejudice from the instruction.

The court's poll consisted of five stock questions:

1.    Were these and are these your verdicts?

2.    Was each such verdict based on the law I gave you and the instructions and none other than the instructions?

3.    Was each such verdict based only on the facts that were admitted into evidence and none other?

13

4. In your verdicts, did you disregard everything I told you to disregard and not include any such matters in your deliberations?

5. In your verdicts where evidence was limited to a particular purpose and not generally for all purposes, did you limit your consideration of that evidence to that particular purpose?

*See* R. vol. III, at 2238-48. None of the questions directly addressed the instruction.[6]

For purposes of harmlessness, we have two possible questions. The first possible question is whether even the "slightest possibility" of prejudice existed notwithstanding the vague, generic poll given at the end of the trial. *See* Part III, above. The second possible question is whether the government proved that the instructional error was harmless based on the jurors' answers to the poll. *See id.* In my view, the answer to both questions is "no."

The answer to both questions remains "no" even when we consider the curative instructions and the questioning of Mr. Schwartz's ex-wife. Under *Maestas*, the curative instructions did not avert the prejudice. As for the questioning, there was no independent evidence that Mr. Schwartz had previously been charged with the relevant crimes. Thus, the jury could

---

[6] The government appears to contend that "individually polling the jurors on whether they read or understood the erroneously included instruction[] may have compounded the problem" of jury prejudice. Appellee's Ans. Br. at 22 n.6. But the jury was polled after it had already issued its verdict. Thus, a more specific poll could not have affected the verdict.

14

justifiably doubt whether Mr. Schwartz had previously been charged with these crimes. In addition, even if the jury believed that Mr. Schwartz had previously been charged with these crimes, the prejudice from that belief would pale in comparison to the prejudice from the instructional error.

## V. The government's evidence did not render the instructional error harmless.

The majority characterizes the government's evidence as ample. If the majority means that the evidence was enough for a reasonable jury to find guilt, I agree. But if the majority instead means that the government's evidence was so overwhelming that the instructional error was harmless,[7] I would respectfully disagree. The evidence against Mr. Schwartz was not overwhelming, and the jury could reasonably have voted to acquit.

For instance, a jury could reasonably have concluded that Mr. Schwartz had strived to stay within the bounds of the law. For this conclusion, the jury could have drawn on trial testimony indicating that

- Mr. Schwartz had consulted with an attorney to determine whether the pain management center was complying with the applicable regulations,

- Mr. Schwartz had researched the applicable regulations,

- Mr. Schwartz had consistently emailed articles to his staff about legal problems confronting other pain management centers, hoping that these articles would prevent the sort of mistakes that these centers had made,

---

[7] The government does not argue that the instructional error was harmless based on the strength of the evidence against Mr. Schwartz.

15

- Mr. Schwartz had pushed for various safeguards, including but not limited to random urinalysis and the use of Colorado's Prescription Drug Monitoring Program,[8]

- Mr. Schwartz had consistently emphasized the importance of following the law, and he would confront the doctor and the staff if he learned that they had bent or broken the rules,

- Mr. Schwartz had emphasized the importance of maintaining pristine, detailed records; had encouraged the use of electronic records; and had promoted the appropriate documentation of treatment,

- Mr. Schwartz had encouraged a 20% reduction in medications to help ensure that the center stayed within the bounds of the law,[9] and

---

[8] As the Centers for Disease Control and Prevention explains on its website,

> Prescription Drug Monitoring Programs (PDMPs) are state-run electronic databases used to track the prescribing and dispensing of controlled prescription drugs to patients. They are designed to monitor this information for suspected abuse or diversion (i.e., channeling drugs into illegal use), and can give a prescriber or pharmacist critical information regarding a patient's controlled substance prescription history.

*Prescription Drug Monitoring Programs (PDMPs)*, Centers for Disease Control and Prevention, https://www.cdc.gov/drugoverdose/pdmp/index.html (last updated March 21, 2017). This webpage does not appear in the appellate record, but is subject to judicial notice. *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of materials on the websites of two federal agencies); *see also Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012) ("The contents of an administrative agency's publicly available files . . . traditionally qualify for judicial notice . . . .").

[9] The center achieved the 20% reduction encouraged by Mr. Schwartz.

16

- Mr. Schwartz had urged the offering of discounts to encourage use of alternative therapies, such as physical therapy, that could decrease or even eliminate the need for opioids.

In addition, former employees testified that

- while working for the center, they had not believed that they were doing anything illegal, and

- the doctor, not Mr. Schwartz, had the final say on all medical-related questions.

Based on this testimony, the jury could reasonably have concluded that

- there was no unlawful conspiracy and

- any illegal activity at the center was attributable to the doctor, not to Mr. Schwartz.

The jury could also justifiably question the strength of the government's evidence. That evidence largely consisted of the experiences of three patients. But the jury could reasonably have downplayed the experiences of these three patients because the center had supplied treatment for hundreds of other patients.

The government also relied heavily on the experiences of an undercover agent who had posed as a patient. The jury could reasonably downplay this evidence, too, because the undercover agent had attended the center shortly after it had taken over the patient base from the prior owner. At this point, the jury could reason, the center had to deal with a flood of new patients, many of whom were frantic because their former doctor was gone and they were running out of medication. The record also

17

indicates that the center was forced to treat some of these patients without referring to their medical records because they had been seized by law enforcement.

Based on the evidence as a whole, a jury could reasonably have voted to acquit. Thus, I would draw two conclusions based on the two possible standards:

1.   There was at least the "slightest possibility" that the outcome would have been different without the instructional error.

2.   The government failed to prove that the instructional error was harmless.

These two conclusions lead me to believe that the district court abused its discretion in denying Mr. Schwartz's motion for a mistrial.

\* \* \*

The district court unquestionably erred by telling the jury that evidence existed even though none was ever presented. The subject-matter was devastating, a felony conviction, tainting the jury's perception of Mr. Schwartz from the outset. Without this devastating error, there was at least the "slightest possibility" of a different outcome. And none of the government's arguments would have satisfied its potential burden to prove that the instructional error was harmless. Thus, whichever harmlessness standard applies, the district court's error was not harmless and I would reverse the conviction. Because the majority affirms, I respectfully dissent.

18